UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| EZEQUIEL M., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:20-cv-1626-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM |
| | § | DECISION AND ORDER |
| Defendant. | § | |

## INTRODUCTION

Plaintiff Ezequiel M. ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied his application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 17).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 13, 14. Plaintiff also filed a reply brief. *See* ECF No. 15. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 13) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 14) is **GRANTED**.

## BACKGROUND

Plaintiff protectively filed an application for SSI on January 17, 2017, alleging disability beginning June 1, 2012 (the disability onset date), due to ankle injury, schizophrenia, manic depression, severe anxiety, posttraumatic stress disorder ("PTSD"), diabetes, and aggressive behaviors. Transcript ("Tr.") 218-24, 254. Plaintiff's claim was denied initially on May 1, 2017

(Tr. 119), after which he requested an administrative hearing (Tr. 127). On June 6, 2019, Administrative Law Judge Mary Mattimore ("the ALJ") conducted a hearing in Buffalo, New York. Tr. 51-102. Plaintiff appeared and testified at the hearing and was represented by Patricia M. Brooks Bundy, an attorney. Tr. 28. Mary Everts, an impartial vocational expert ("VE") from Rehab Team Associates, also appeared and testified at the hearing. *Id*.

The ALJ issued an unfavorable decision on July 1, 2019, finding that Plaintiff was not disabled. Tr. 28-45. On September 14, 2020, the Appeals Council denied Plaintiff's request for further review. Tr. 8-12. The ALJ's July 1, 2019 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

### II.   The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71

(1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national

economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168

F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and

made the following findings in her July 1, 2019 decision:

1. The claimant has not engaged in substantial gainful activity since January 17, 2017, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments:  post-traumatic ankle arthritis, status post surgeries in right ankle, arthritis of the right foot, peripheral vascular disease, obesity, post-traumatic stress disorder ("PTSD"), depression, anxiety disorder, bipolar disorder, attention deficit hyperactivity disorder("ADHD"), antisocial personality disorder, other specified psychotic disorder and adjustment disorder with mixed anxiety and depressed mood (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.967(b)[1] except the claimant can only occasionally stoop, climb stairs, ramps, kneel, crouch and crawl but cannot climb ladders or ropes; the claimant can perform only a low stress job defined as simple routine work, with one or two steps, and simple workplace decisions, not  at  a production rate pace (assembly line) pace; the claimant can tolerate only minimal changes in workplace processes and settings; and the claimant can tolerate occasional interaction with supervisors but only incidental interaction (defined as 20% of the day or less) with coworkers and the public, and cannot perform tandem or team work.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on July 15, 1975 and was 41 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

---

[1]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

7.  The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 17, 2017, the date the application was filed (20 CFR 416.920(g)).

Tr. 28-45.

Accordingly, the ALJ determined that, based on the application for supplemental security benefits protectively filed on January 17, 2017, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act. Tr. 45.

## ANALYSIS

Plaintiff asserts two points of error. Plaintiff first argues that the ALJ failed to properly apply the treating physician rule to the opinion of Jennifer Gurske-dePerio, M.D. ("Dr. Gurske-dePerio"). *See* ECF No. 13-1 at 1, 13-17. Plaintiff argues that the ALJ did not provide "good reasons" for discounting Dr. Gurske-dePerio's "disability-supporting opinion" through proper consideration of the regulatory factors at 20 C.F.R. § 416.927(c)(2). *See id*. Next, Plaintiff argues that the ALJ erred by failing to find that Plaintiff's "well-documented agoraphobia" was not its own severe impairment and failing to account for this impairment in the RFC determination or analysis. *See id*. at 17-19.

The Commissioner argues in response that the ALJ properly afforded Dr. Gurske-dePerio's opinion partial weight because: the opinion was relayed merely through a checkbox form without supportive text or explanations; the opinion was vague; and the opinion was contradicted by

Plaintiff's own testimony. *See* ECF No. 14-1 at 8-16. Furthermore, argues the Commissioner, even if the ALJ's analysis did not discuss each factor of the treating physician rule, remand is not warranted, because other evidence in the record, including other opinion evidence and Plaintiff's treatment history, supports the ALJ's RFC finding. Moreover, notes the Commissioner, Plaintiff appears to have seen Dr. Gurske-dePerio on only two occasions, both of which were before the relevant period; thus, Plaintiff's treating relationship with Dr. Gurske-dePerio was neither longstanding nor extensive. *See id*.

With respect to Plaintiff's second point, the Commissioner argues that the record fails to show any symptoms or limitations solely attributable to agoraphobia that were independent of the many other overlapping severe mental impairments the ALJ did find, including PTSD, ADHD, depression, anxiety disorder, bipolar disorder, antisocial personality disorder, other specified psychotic disorder, and adjustment disorder with mixed anxiety and depressed mood. *See id*.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ appropriately assigned partial weight to Dr. Gurske-dePerio's treating physician opinion and articulated good reasons for the weight assigned in compliance with the Commissioner's regulations and case law. Furthermore, the ALJ properly concluded that Plaintiff's severe impairments resulted in an RFC for a range of light work with additional exertional and non-exertional limitations. In so

concluding, the ALJ properly accepted and incorporated into the RFC all the well-supported limitations and reasonably discounted other restrictive limitations unsupported by and inconsistent with the record as a whole. Accordingly, the Court finds no error.

The record indicates that Plaintiff has post-traumatic arthritis in his right ankle following three ankle surgeries, with mention in the record of a possible fourth surgery consisting of a total ankle replacement, which had yet to be performed. *See, e.g.*, Tr. 501, 561, 623.  The record also documents a history of emotional and behavioral difficulties resulting from an abusive childhood, including depression, anxiety, bipolar disorder, and PTSD; however, without significant mental health treatment other than medication management and sporadic outpatient therapy. *See, e.g.*, Tr. 388-422, 423-34, 472, 483, 575-83, 606-21.

Plaintiff sought treatment at Lake Shore Behavioral Health ("Lake Shore") from January to May 2014. Tr. 388-93. He was discharged due to "no commitment to treatment." Tr. 390. He had attended only four out of ten scheduled appointments, including missing two psychiatric evaluations. *Id*.

Plaintiff again sought treatment at Lake Shore in September 2015. Tr. 483-91. During a behavioral health assessment on September 21, 2015, Plaintiff complained of increasing depression and anxiety. Tr. 483. He stated he had been "in counseling for years" due to "a lot of trauma growing up, from deaths to sexual abuse to being raised in a violent dysfunctional family," and he felt that talking in counseling was "helpful." *Id*. He also reported auditory hallucinations themed around his past childhood trauma. *Id*. Plaintiff was not working at the time and indicated that he did not remember the last time he worked; he also indicated that his ability to work had been inhibited by his "many surgeries," notably not due to his mental health symptoms Tr. 485.

Treatment recommendation was individual therapy and an initial psychiatric assessment, to be followed with possible monthly medication management visits. *Id*.

Plaintiff had an initial psychiatric assessment at Lake Shore on September 20, 2015. His chief complaint was, "I'm running out of my medications." Tr. 397. He reported he had been "at Mid-Erie until last month and [was] now out of medications." *Id*. Plaintiff reported he was taking psychotropic medications, including Strattera, Prozac, Seroquel, and Xanax. *Id*. Plaintiff's mental status examination was mostly benign, other than stating "I'm not right" with respect to his mood and reporting voices. Tr. 399-400. Plaintiff did not go into detail about the "voice" he hears, but the record indicates that it was "not command in nature." Tr. 400. The record also indicates that details of Plaintiff's reported systems were "somewhat vague" and "evasive." Tr. 401. Although Plaintiff reported that he was currently prescribed Xanax, he actually had not been prescribed Xanax in six months. *Id*. When confronted with this, Plaintiff stated Xanax had worked for him in the past. *Id*. The record notes that Plaintiff "appear[ed] to have some medication seeking behavior that will be monitored," and records from Mid-Erie would be reviewed before prescribing any controlled substances. *Id*. Plaintiff's prognosis was noted to be "limited." *Id*. With exception of anxious affect and erratic sleeping patterns, Plaintiff's mental status examinations thereafter were largely benign. *See* Tr. 399, 411, 413, 415, 417, 419, 421.  Following multiple no shows and lack of follow up, the record reflects that Plaintiff was again discharged from Lake Shore in May 2016. Tr. 407.

A note from Plaintiff's primary care physician, Robert Erickson, D.O. ("Dr. Erickson"), in November 2015 documents that Plaintiff reported having multiple daily panic attacks for three months (Tr. 341), but Dr. Erickson's psychiatric findings were largely normal, other than anxious

mood, and his adjustment disorder with mixed mood was described as "stable on Lexapro" (Tr. 347).

On January 14, 2016, Plaintiff presented to Dr. Gurske-dePerio for evaluation of his right posterior ankle pain and lateral foot pain. Tr. 368. Plaintiff reported that his ankle "gave out" and felt "unstable with walking." *Id*. The record states that "Dr. Ritter [would] no longer see him as he missed and cancelled too many appointments and their office." *Id*. Dr. Gurske-dePerio noted that Plaintiff had a history of a talus fracture from a 1994 motor vehicle accident, left ankle arthroscopy with exostectomy, removal of loose body ankle, and exostectomy tibia and talus in 2006, and right subtalar fusion with right femur RIA in 2011. *Id*. Plaintiff stated that he was "at the height of his inability to ambulate normally." *Id*.

Upon examination, Plaintiff's gait was nonantalgic; he used no assistive devices, and his ankle, while tender with 2+ effusion and showing limitation in ranges of motion, was stable; his midfoot and forefoot dynamics were normal; his strength was 5/5; and he showed negative Thompson test, negative squeeze test, and negative Holman's sign. Tr. 369. Noting Plaintiff's risk factors, including diabetes and obesity, no ankle fusion was recommended: instead, Plaintiff was recommended to utilize nonoperative and conservative care. Tr. 370. Dr. Gurske-dePerio filled out Plaintiff's disability forms but instructed him "to have primary care fill out [disability forms] from now on." She also stated, "I will not do permanent disability." Tr. 371. X-rays at that time documented no fracture, dislocation, malalignment, or degenerative changes, old talar neck fracture with hardware consisting of two screws in place, subtalar fusion with two intact screws, posttraumatic arthritis in the ankle described as severe, possible subtalar nonunion and avascular necrosis talus described as mild. Tr. 372.

On the same date, January 14, 2016, Dr. Gurske-dePerio completed a "checkbox" medical examination questionnaire for the New York State Office of Disability Assistance. Tr. 357-58. Dr. Gurske-dePerio noted that Plaintiff's diagnoses included bipolar, diabetes, talus fracture, posttraumatic ankle arthritis, depression, and PTSD, and these diagnoses were expected to last more than 12 months. *Id*. She checked boxes indicating that Plaintiff was "very limited" in the functional areas of walking, standing, lifting, carrying, and stairs and other climbing and "moderately limited" in his ability to push, pull, and bend. Tr. 358. Dr. Gurske-dePerio indicated that Plaintiff's limitations in walking and standing were due to his arthritis, posttraumatic arthritis, and diabetes and opined that Plaintiff's limitations would last more than 12 months. *Id*.

On February 4, 2016, consultative psychologist Susan Santarpia, Ph.D. ("Dr. Santarpia") performed a consultative psychological assessment for the Erie County Department of Social Services. Tr. 359-64. Plaintiff reported a history of PTSD, bipolar disorder, ADHD, psychosis, schizophrenia, and severe anxiety attacks. Tr. 359. He reported he was currently receiving outpatient treatment at Lake Shore Behavioral Health. *Id*. Plaintiff reported that he believed that medication decreased the intensity and frequency of his auditory hallucinations, although it did not completely get rid of them. *Id*. Upon examination, Plaintiff displayed abnormal attention and concentration, due to "suspected lack of effort/possible malingering." Tr. 361. His cognitive functioning was also abnormal; Dr. Santarpia noted that Plaintiff had a ninth-grade education. *Id*. Dr. Santarpia opined that Plaintiff was moderately limited (unable to function 50% of the time) in the areas of performing complex tasks independently, maintaining attention and concentration for rote tasks, and regularly attending to a routine and maintaining a schedule. Tr. 362-63.

Plaintiff returned to Dr. Gurske-dePerio on February 23, 2016. Tr. 380-84. A CT scan of Plaintiff's right ankle taken on January 28, 2016 demonstrated moderate tibiotalar joint

degenerative osteoarthritis with loose bodies anterior recess and one loose body posterior recess of the tibiotalar joint, and anterior tibiotalar impingement. Tr. 379. Dr. Gurske-dePerio offered a CAM Boot for comfort of the right leg, which Plaintiff declined. Tr. 383. Dr. Gurske-dePerio referred Plaintiff to pain management and advised him that she would not perform any surgery until he had stopped smoking for one month. *Id*. She also noted that Plaintiff had left plantar fasciitis, "a repetitive overuse type injury," for which surgery was not recommended, as it "takes, on average, 18 months to resolve on its own." *Id*. Dr. Gurske-dePerio prescribed gastroc stretching, plantar fascia stretching, night splints and gel heel cups. Tr. 384.

On December 13, 2016, Plaintiff established care with Alexandria Schultz, PA ("Ms. Schultz"), at WNY Medical, PC. Tr. 449. Plaintiff reported that his biggest concern was his increased panic attacks over the past few months. *Id*. Plaintiff reported that his symptoms were "at the worst when he was in a vehicle or in a large group[;] however, his wife, who accompanied him state[d] that his symptoms were now happening at home." *Id*. Plaintiff reported that he is being followed by psychiatrist "Dr. Mark" and therapist "Rebecca" at Buffalo Psychiatry, but Dr. Mark would "only prescribe certain medications." *Id*. Plaintiff declined any non-controlled substances that Ms. Schultz could offer for his anxiety and agitation.  Tr. 453.Ms. Schultz referred Plaintiff to psychiatry and recommended that he continue counseling. *Id*.

On February 6, 2017, Plaintiff presented to podiatrist Maurice Gelia, D.P.M. ("Dr. Gelia"), complaining of severe right ankle pain. Tr. 496. Dr. Gelia noted a history of an apparent talus fracture at the neck of the talus in 1994 with ORIF of the fracture, and an apparent subtalar joint fusion in 2011.  *Id*. Examination findings of Plaintiff's right foot documented pain on palpation and limitation in his range of motion, but he showed normal muscle strength; he had an unremarkable vascular examination; denied claudication; and had normal neurological and

dermatological findings. *Id*. Based on x-ray findings, Dr. Gelia assessed that Plaintiff had "indwelling screws from previous surgical procedures," including a subtalar joint fusion of the right foot; significant to severe degenerative joint disease with arthritis of the right ankle joint and talonavicular joint; and arthritis of the foot. Tr. 496. He suggested that Plaintiff seek "probable ankle joint fusion with possible pantalar fusion" and recommended that Plaintiff follow up with Dr. Rohrbacher to determine what treatment might be best for him. *Id*.

On the same date, February 6, 2017, Dr. Gelia completed a "checkbox" medical examination questionnaire for the New York State Office of Disability Assistance. Tr. 355-56. Dr. Gelia checked boxes indicating that Plaintiff was "very limited" in the functional areas of walking, standing, lifting, carrying, pushing, pulling, bending, and stairs and other climbing. Tr. 356. He indicated that any working condition that involved standing, or walking would be contraindicated. *Id*. He noted that these limitations could be expected to last approximately four to six months. *Id*.

On March 27, 2017, Plaintiff returned to Ms. Schultz for follow-up of his right ankle pain, anxiety, depression, and stress. Tr. 498. Plaintiff reported that he had consulted with orthopedist Dr. Rorhbacher for his ankle and that a total ankle replacement surgery was recommended. Tr. 498, 501. Although Dr. Gelia recommended that Plaintiff follow up with Dr. Rohrbacher for his right ankle issues (Tr. 497), and Plaintiff reported to Ms. Schultz that he had, in fact, consulted with Dr. Rohrbacher who recommended ankle replacement surgery (Tr. 498), there is no evidence that Plaintiff actually sought the recommended surgical procedure. Tr. 38. Ms. Schultz indicated that Plaintiff was to continue to follow up with "Dr. Hawk at Buffalo Psychiatry" for his mental health issues. Tr. 501.

Ms. Schultz also completed a medical report for the Department of Social Services on March 27, 2017. Tr. 503-04. Ms. Schultz indicated diagnoses of PTSD, anxiety, depression, and

degenerative ankle that needed fusion. *Id*. She opined that Plaintiff was limited to sedentary work, but he was only able to sit a few hours per day, and he could perform no standing, walking, lifting, or climbing stairs without pain. *Id*. She noted that Plaintiff had pain, discomfort, and numbness in his right foot and ankle, and in his leg up to his back. *Id*. She also noted that Plaintiff had severe mood swings, symptoms of non-focus, seclusion, shaking, rapid heart rate, and dizziness, and his mental health symptoms included no focus, chronic mental illness, no attention, no interaction with others, cannot remember things, and that he did not follow through. Tr. 503-04. She opined that Plaintiff had a marked restriction of daily activities and was seriously impaired in his ability to relate to others. Tr. 504. Ms. Schultz further opined that Plaintiff was unable to perform his usual work and unable to do any other type of work. *Id*.

On March 27, 2017, psychiatrist A. A. Haque, M.D. ("Dr. Haque") completed a "checkbox" medical examination questionnaire for the New York State Office of Disability Assistance. Tr. 465-66. Dr. Haque indicated that he had treated Plaintiff since December 2016 at the "M/B Clinic" for anxiety and PTSD. Tr. 465. Dr. Haque noted that Plaintiff was currently prescribed Prozac and Thorazine, and he expected Plaintiff's conditions to be permanent. *Id*. Dr. Haque checked boxes indicating that Plaintiff had "moderate limitations" in all areas of mental functioning, including understanding and remembering instructions, carrying out instructions, maintaining attention/concentration, making simple decisions, interacting appropriately with others, maintaining socially appropriate behavior without exhibiting behavioral extremes, maintaining basic standards of personal hygiene and grooming, and functioning in a work setting at a consistent pace. Tr. 466. Dr. Haque further opined that Plaintiff required a less stressful work situation due to his chronic mental illness. *Id*.

On April 5, 2017, Plaintiff underwent a consultative psychiatric evaluation performed by Dr. Santarpia in connection with his disability claim. Tr. 472-76. Plaintiff reported diagnoses of anxiety and PTSD due to sexual abuse at age seven and reported that he was currently receiving psychotropic medication management from Dr. Haque and counseling from Rebecca at Buffalo Psychiatric Center. Tr. 472. Dr. Santarpia noted that Plaintiff's overall presentation and manner of relating was adequate, but he exhibited an irritated affect. Tr. 473-74. She also noted that during the attention and concentration portion of the evaluation, Plaintiff appeared to be "somewhat malingering" in his responses to math questions. Tr. 474. She estimated that his cognitive functioning was in the low-average range of ability, and his insight and judgment were fair. *Id*. Dr. Santarpia opined that Plaintiff had mild impairment in interacting adequately with supervisors, coworkers, and the public, and regulating emotion, controlling behavior, and maintaining wellbeing. Tr. 475. She further opined that the results of the examination were consistent with psychiatric problems that until better stabilized may at times interfere with his ability to function on a daily basis. *Id*.

Likewise on April 5, 2017, Hongbiao Liu, M.D. ("Dr. Liu"), performed a consultative examination in connection with Plaintiff's disability claim. Tr. 467-71. Dr. Liu observed that Plaintiff appeared to be in no acute distress; his gait was walking with a limp; he could not perform heel and toe walking because of low back pain; he could squat 40% because of low back pain; and he had normal stance, used no assistive devices, needed no help changing for exam or getting on and off exam table and was able to rise from chair without difficulty. Tr. 468. Although limitations in his ankle ranges of motion were observed, there were no evident subluxations, contractures, ankylosis, or thickening, his joints were stable and nontender, there was no redness, heat, swelling, or effusion. Tr. 469. Neurologically, Plaintiff's DTRs (deep tendon reflexes) were physiologic and

14

equal in upper and lower extremities, his right leg sensation was decreased compared to left side, but he showed 5/5 strength in the upper and lower extremities and his extremities revealed no cyanosis, clubbing, or edema, his pulses were physiologic and equal, there was no significant varicosities or trophic changes and no muscle atrophy evident. *Id*. Based on the examination, Dr. Liu opined that Plaintiff had mild to moderate limitations for prolonged walking, bending, and kneeling. Tr. 470.

On November 30, 2017, Plaintiff reported to his providers at Tonawanda Recovery Center that he had been unable to leave his home without extreme difficulty and he had been unable to work because he did not get along with others. Tr. 508. Plaintiff reported that he had not seen his grandchildren in four years and that his agoraphobia had been a barrier to getting ankle surgery and seeing a cardiologist. Tr. 513. He reported that he did not have friends and he preferred to be alone. *Id*. Plaintiff also reported that two years prior he had a panic attack while on a bus and got off and walked six hours in the snow to get home, despite having an all-day bus pass. *Id*.

On December 18, 2017, Plaintiff presented for mental health treatment with Sharon Yager, NP ("Ms. Yager"), at Elmwood Recovery Center, complaining that "I can't leave my house." Tr. 521-25. Plaintiff reported that he had been receiving his psychiatric treatment from Buffalo Psychiatric Center, but he was unable to get into a moving car to get to his appointments there, and he had been "off meds for months." Tr. 521. Plaintiff reported past trauma such as being locked in an attic and being sexually abused as a child. *Id*. Plaintiff stated that due to this, he was currently unable to be in open places or closed spaces. *Id*. Plaintiff reported that he had heard a male voice inside his head telling him to hurt himself and others since he was a child. Tr. 522. He reported that he first started having panic attacks in 2002 "after a few family members died in front of him,"

and he continued to have panic attacks multiple times per week with unknown triggers. *Id*. Plaintiff also reported past suicide attempts and stated he had been arrested 23 times, mostly for assault. *Id*.

On March 7, 2018, Plaintiff returned to Ms. Yager for medication management. Tr. 533. Plaintiff reported he had stopped taking Thorazine two weeks ago because it made him "too foggy and tired," but he did not report this to his counselor." *Id*. Plaintiff's girlfriend reported that Plaintiff had a lot of issues destroying things when he was angry and especially when he was panicked. *Id*. Plaintiff requested "an injection for his mood," and Ms. Yager suggested starting injectable Invega Sustenna, to which Plaintiff agreed. *Id*.

On March 12, 2019, Plaintiff presented to Buffalo Psychiatric Center to resume medications. Tr. 585. Plaintiff was evasive and irritable in providing his criminal background information. *Id*. Plaintiff reported that he went "0-100 in one second" and "[got] violent and aggressive." *Id*. He also reported extreme anxiety, panic attacks, and auditory hallucinations. *Id*. Upon mental status examination, Plaintiff was mostly pleasant but became irritable at times. Tr. 600. He exhibited an anxious and depressed mood; his affect was irritable; he was guarded at times, and exhibited poor concentration and attention span at times, evidenced by having difficulty following the conversation. *Id*. Plaintiff's recent memory was fair to poor, and his judgment and insight were both poor. *Id*. Plaintiff was prescribed Xanax as needed for panic attacks and prior to going out and also started on Chlorpromazine, Prozac, Gabapentin, and Prazosin. Tr. 602-03.

A claimant's RFC is the most he can still do despite his limitations and is assessed based on an evaluation of all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(d)(2) (stating the

assessment of a claimant's RFC is reserved for the Commissioner). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Additionally, it is within the ALJ's discretion to resolve genuine conflicts in the evidence. *See Veino v Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002). In so doing, the ALJ may "choose between properly submitted medical opinions." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Moreover, an ALJ is free to reject portions of medical-opinion evidence not supported by objective evidence of record, while accepting those portions supported by the record. *See Veino*, 312 F.3d at 588. Indeed, an ALJ may formulate an RFC absent any medical opinions. "Where, [] the record contains sufficient evidence from which an ALJ can assess the [plaintiff's] residual functional capacity, a medical source statement or formal medical opinion is not necessarily required." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (internal citations and quotation omitted).

Moreover, the ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in [his] decision," because the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (the RFC need not correspond to any particular medical opinion; rather, the ALJ weighs and synthesizes all evidence available to render an RFC finding consistent with the record as a whole);

*Castle v. Colvin*, No. 1:15-CV-00113 (MAT), 2017 WL 3939362, at *3 (W.D.N.Y. Sept. 8, 2017)
(The fact that the ALJ's RFC assessment did not perfectly match a medical opinion is not grounds
for remand.).

Furthermore, the burden to provide evidence to establish the RFC lies with Plaintiff—not
the Commissioner. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *see also Talavera v. Astrue*, 697
F.3d 145, 151 (2d Cir. 2012) ("The applicant bears the burden of proof in the first four steps of the
sequential inquiry . . . ."); *Mitchell v. Colvin*, No. 14-CV-303S, 2015 WL 3970996, at *4
(W.D.N.Y. June 30, 2015) ("It is, however, Plaintiff's burden to prove his RFC."); *Poupore v.
Astrue*, 566 F.3d 303, 305-06 (2d Cir. 2009) (The burden is on Plaintiff to show that she cannot
perform the RFC as found by the ALJ.).

Plaintiff alleges that the ALJ failed to properly apply the treating physician rule to the
opinion of Dr. Gurske-dePerio and did not provide "good reasons" for discounting Dr. Gurske-
dePerio's "disability-supporting opinion" through proper consideration of the regulatory factors at
20 C.F.R. § 416.927(c)(2). *See* ECF No. 13-1 at 1, 13-17. For claims filed prior to March 27,
2017,[2] the opinions of Plaintiff's treating physicians should be given "controlling weight" if they
are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and
[are] not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§
404.1527(c)(2). A legal conclusion "that the claimant is 'disabled' or 'unable to work' is also not
controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-
CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§

---

[2] New regulations regarding the evaluation of medical evidence and rescission of Social Security Rulings 96-2p, 96-
5p, 96-6p, and 06-03p, took effect on March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical
Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Because Plaintiff's application was filed on January 17, 2017, the
previous regulations are applicable to his claim.

404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").

An ALJ is required to consider several factors in determining how much weight an opinion should receive, including the length of the relationship and frequency of examinations, nature of the relationship, medical evidence that supports the opinion, consistency with the record as a whole, and if the physician's specialty is relevant to the impairment. *Burgess v. Astrue*, 537 F. 3d 117, 129 (2d Cir. 2008). If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also Schaal v. Apfel*, 134 F. 3d 496, 503-504 (2d Cir. 1998). Good reasons for not assigning treating source opinion controlling weight are shown through express consideration of these factors, although a "searching review of the record" can also demonstrate good reasons for the weight given the opinion that does not traverse the treating source rule. *See Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In addition, a treating source opinion cannot be entitled to controlling weight if it is not consistent with the source's own treatment notes or with other substantial evidence. *See Halloran*, 362 F.2d at 31-32 (citing *Veino*, 312 F.3d at 588); *Cichocki v. Astrue*, 729 F. App'x 71, 77 (2d Cir. 2013).

Contrary to Plaintiff's contentions, the ALJ in this case properly analyzed the opinion evidence and the other evidence of record when developing Plaintiff's RFC, and substantial evidence supports the ALJ's RFC finding. Tr. 35-44. *See* 20 C.F.R. §§ 404.1527, 416.927. Even if the ALJ's analysis did not expressly consider each factor, remand is not warranted, because, based on a "searching review" of the record evidence, the Court finds that the "substance of the treating physician rule was not traversed." *Estrella*, 95 F.3d at 96 (quoting *Halloran*, 362 F.3d at

32); *see also* 56 Fed. Reg. 36932, 36935-36 (August 1, 1991), *as amended* 77 Fed. Reg. 10651, 10656 (February 23, 2012) (re-designating paragraphs (d) through (f) as (c) through (e)) (other amendments omitted) (explaining that not every factor will apply in every case and certain factors (for example, treatment relationship) will sometimes take precedence over other factors; and at other times, certain combinations of factors will result in a finding that one opinion is entitled to more weight than another, or that a single opinion is entitled to great weight while another might not be). Furthermore, the Court notes a number of Second Circuit cases affirming the Commissioner's final decisions where it found that the ALJ gave good reason for the less-than-controlling weight accorded treating source opinions even if their analyses might not have explicitly considered all of the *Burgess* factors. *See e.g.*, *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48-49 (2d Cir. 2021); *Holler v. Saul*, 852 F. App'x 584, 585-86 (2d Cir. 2021); *Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x 23, 26 (2d Cir. 2019); *Guerra v. Saul*, 778 F. App'x 75 (2d Cir. 2019); *Grega v. Saul*, 816 F. App'x 580, 582 (2d Cir. 2020). Contrary to Plaintiff's argument (*see* ECF No. 15 at 2), the Court may conduct a "searching review" of the record to assure that the "substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 96.

First, Plaintiff's argument ignores the entirety of the ALJ's decision, including the lengthy RFC analysis leading up to her discussion of the opinion evidence. Tr. 35-39. Before turning to Dr. Gurske-diPerio's opinion, the ALJ discussed Plaintiff's subjective allegations of limitation, and his treatment history in great detail. *Id*. This included mentioning Plaintiff's reported difficulty with lifting, standing, waking, sitting, climbing stairs, kneeling, squatting, and reaching, that he had pain in the right ankle which radiated into his leg and hip, that this pain had gotten worse over time to as severe as 10/10, and that he had pain all day, every day. Tr. 36. The ALJ further noted that Plaintiff had testified to multiple ankle surgeries over the years, stemming from a fracture of

the ankle in 1994, with the most recent surgery in 2011. Tr. 36. However, the ALJ reasonably found Plaintiff's statements about the intensity, persistence, and limiting effects of his impairments inconsistent with the evidence in the record. Tr. 37.

As the ALJ noted, the medical record showed that Plaintiff saw Dr. Gurske-dePerio in January 2016, and reported right ankle and foot pain, and alleged an inability to ambulate normally, but examination revealed a non-antalgic gait, he used no assistive devices, and while his ankle was tender and limited in range of motion, it was stable. Tr. 37, 368-69. Midfoot and forefoot dynamics were normal, strength was full at 5/5, and various tests, including Thompson test, squeeze test, and Holman's sign, were negative. Tr. 37, 369. Because Plaintiff had risk factors including diabetes and obesity, further surgery such as ankle replacement was ruled out, and instead, non-operative, conservative care was recommended. Tr. 37, 370. The ALJ further noted that x-rays of Plaintiff's right ankle showed an old fracture with hardware in place, but documented no fracture, dislocation, malalignment, or degenerative changes. Tr. 37, 372. Arthritis was described as severe, and avascular necrosis described as mild. Tr. 37, 372. Further treatment notes by Dr. Gurske-dePerio reflected that Plaintiff continued to elect non-operative intervention and declined other treatments, such as a CAM boot, and declined to quit smoking. Tr. 37, 383.

When Plaintiff saw podiatrist Dr. Gelia, he complained of severe pain, but examination documented only pain on palpation, and some limitation in range of motion, but also normal muscle strength, unremarkable vascular examination, and no claudication. Tr. 37, 496. Neurological and dermatological findings were normal. Tr. 37-38, 496-97. As the ALJ noted, although Dr. Gelia recommended that Plaintiff follow up with Dr. Rohrbacher for possible surgery, there is no evidence that Plaintiff actually followed up. Tr. 38, 497.

The ALJ went on to note that the nature and scope of Plaintiff's treatment for his right ankle and foot impairment was consistent with a finding of a reduced range of light work. Tr. 38. As the ALJ noted, the record demonstrated that Plaintiff's condition was managed with conservative treatment modalities. Tr. 38, 497, 501, 558, 562-64. For example, the ALJ noted that when Plaintiff established care at UBMD Family Medicine in March 2018, he was "doing okay for the most part" and his "active problems" list did not include disabling limitations from his ankle. Tr. 38, 552-53. Physical examinations after that time were largely benign, with normal gait and station, no use of assistive devices, and a non-antalgic gait on most occasions. Tr. 38, 343, 346, 369, 381, 412, 414, 418, 420, 422. *See Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say"); *see also O'Heagney-O'Hara v. Comm'r of Soc. Sec.*, 646 F. App'x 123, 126 (2d Cir. 2016) (ALJ appropriately considered claimant's routine and conservative treatment in assessing functioning).

The ALJ next considered the assessment of consultative examiner Dr. Liu, who noted that Plaintiff was in no acute distress, and although Plaintiff walked with a limp and did not walk on his heels and toes, he used no assistive devices, needed no help changing for the examination or for getting on and off the examination table, and was able to rise from a chair without difficulty. Tr. 38, 468. Further, although there was some limitation in range of motion of the ankle, Plaintiff's joints were stable and non-tender, with no redness, heat, swelling, or effusion. Tr. 38, 469. Deep tendon reflexes were physiologic and equal in the upper and lower extremities, and Plaintiff had 5/5 strength in all four extremities. Tr. 38, 469. Dr. Liu assessed only mild to moderate limitations for prolonged walking, bending, and kneeling. Tr. 38, 470.

Moderate limitations are frequently found to be consistent with an RFC for a full range of light work. *See, e.g., Gurney v. Colvin*, No. 14-CV-688S, 2016 WL 805405, at *3 (W.D.N.Y. Mar. 2, 2016) (RFC of light work accounted for moderate limitations in heavy lifting, bending, reaching, pushing, pulling, or carrying) (collecting cases); *Harris v. Comm'r of Soc. Sec.*, No. 09-CV-1112, 2011 WL 3652286, at *5 (N.D.N.Y. July 27, 2011), *report and recommendation adopted*, 2011 WL 3652201 (Aug. 17, 2011) (finding "slight to moderate limitations in activities that require lifting, carrying, and reaching . . . consistent with the ALJ's conclusion that Plaintiff could perform light work"); *Vargas v. Astrue*, No. 10-CV- 6306, 2011 WL 2946371, at *12 (S.D.N.Y. July 20, 2011) (finding "moderate limitations for lifting, carrying, handling objects, and climbing stairs" consistent with RFC for full range of light work); *Hazlewood v. Comm'r of Soc. Sec.*, No. 12-CV-798, 2013 WL 4039419, at *7 (N.D.N.Y. Aug. 6, 2013) (doctor's opinion that plaintiff had "mild to moderate limitations in walking, pushing, and pulling" supported the "ALJ's determination that plaintiff could physically perform light work").

The ALJ assigned Dr. Liu's opinion significant weight, as it was consistent with the overall medical evidence, including the many benign physical examinations outlined by the ALJ. Tr. 39. Contrary to Plaintiff's argument (*see* ECF No. 13-1 at 14-15), consultative examining physician opinions can provide substantial evidence to support an ALJ's conclusions. *Monguer v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983) (noting that a consultative examiner's opinion may constitute substantial evidence in support of an ALJ decision where the opinion is supported by the record evidence). Thus, while a consultative examiner's opinion might not be automatically due any "special" weight, such an opinion can still provide substantial evidence to support the ALJ's decision.

The ALJ also relied on the opinion of state agency reviewing physician D. Miller, D.O. ("Dr. Miller"), who also assessed that Plaintiff could perform light work. Tr. 39, 111-12. As the ALJ noted, Dr. Miller's opinion was afforded significant weight because it was consistent with the recor,  consistent with Dr. Liu's opinion, and based on Dr. Miller's specialized knowledge of the agency's programs. Tr. 39. State agency reviewing physician opinions can constitute substantial evidence to support an ALJ's conclusions. *See Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (the Commissioner's regulations permit the opinions of non-examining sources to constitute substantial evidence in support of the ALJ's decision, and can even override a treating source opinion); *see also Heagney O'Hara*, 646 F. App'x at 126 (the ALJ correctly gave great weight to the opinion of a medical expert; even though he lacked a treating relationship because his opinion was consistent with the objective medical evidence in the record.); *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) (finding that opinion of state agency physician provided substantial evidence to support ALJ's RFC finding).

After summarizing all of the above-noted evidence, the ALJ turned to the opinion from Dr. Gurske-dePerio.[3] Tr. 39, 357-58. The ALJ noted that the opinion was an employability assessment prepared specifically for the Erie County Department of Social Services, which has its own criteria for benefits. Tr. 39; *see* 20 C.F.R. § 416.904 (noting that because other programs have their own definitions, and make decisions based on their own rules, any decision by another program that a claimant is "disabled" for example, is not binding on SSA). Although the ALJ recognized that Dr. Gurske-dePerio was a medical doctor, the ALJ also noted that the opinion was vague. Tr. 358. For instance, the form asked Dr. Gurske-dePerio to check whether Plaintiff was "very limited,"

---

[3] Although Plaintiff correctly notes that the ALJ incorrectly referred to Dr. Gurske-dePerio as "Dr. Delerio" (*see* ECF No. 13-1 at 15), the ALJ's narrative and his citations to the record are sufficiently clear to indicate that he was discussing Dr. Gurske-dePerio's assessment. Tr. 39

"moderately limited," or had "no evidence of limitations" in various areas of functioning, but there was no definition of what those categories meant, or how long in a day Plaintiff could perform such activities. Tr. 358. Similarly, Dr. Gurske-dePerio assessed that Plaintiff was "limited [in] walking[,] standing due to arthritis[,] post-traumatic arthritis, diabetes." Tr. 358. Notably, Dr. Gurske-dePerio did not quantify how limited Plaintiff was in any particular activity, or how much standing or walking Plaintiff could do. Tr. 358. Thus, the ALJ correctly found the opinion vague. The ALJ further noted that Dr. Gurske-dePerio's opinion was contradicted by Plaintiff's own testimony that he was capable of walking to the corner store and his limited testimony regarding any walking limitations. Tr. 39, 62.

While the ALJ may not have expressly discussed the length, frequency, and extent of Plaintiff's treatment relationship with Dr. Gurske-dePerio, the record demonstrates that the relationship was not longstanding or extensive. Plaintiff appears to have seen Dr. Gurske-dePerio on only two occasions, both of which were before the relevant period. Tr. 368-70, 380-84. *See Estrella*, 925 F.3d at 96. Thus, Dr. Gurske-dePerio's treatment relationship with Plaintiff can be characterized as peripheral, at best, and is distinguishable from the cases cited by Plaintiff, which included "numerous visits over a stretch of years." *See* ECF No. 13-1 at 16 (citing *Daniels v. Commissioner of Social Security*, 2020 WL 6253304, at *3 (W.D.N.Y. Oct. 23, 2020)). The Second Circuit's affirmance in *Curry* is more on point. There, the Court concluded that the ALJ provided good reasons through a "satisfactory functional application of the *Burgess* factors" in affording partial weight to the opinion of a treating orthopedist who, the "record as a whole revealed," treated the plaintiff only sporadically. *Curry*, 855 F. App'x at 48-49.

Furthermore, as noted above, Dr. Gurske-dePerio's opinion was provided on a "checkbox" form, which this has Court has noted previously, are of limited evidentiary value. *See, e.g., Koerber*

*v. Comm'r of Soc. Sec.*, No. 6:19-CV-1070-DB, 2020 WL 1915294, at *1 (W.D.N.Y. Apr. 20, 2020) (citing *Augustine v. Comm'r of Soc. Sec.*, No. 6:15-CV-06145-EAW, 2016 WL 5462836, at *1 (W.D.N.Y. Sept. 28, 2016); *see also Halloran*, 362 F.3d at 31 n.2 ("[t]he standardized form . . . is only marginally useful for purposes of creating a meaningful and reviewable factual record"); *Slattery v. Colvin*, 111 F. Supp. 3d 360, 372-73 (W.D.N.Y. 2015) ("of limited evidentiary value") (citing *Gray v. Astrue*, No. 09-CV-00584 (MAT), 2011 WL 2516496, at *5 (W.D.N.Y. June 23, 2011)); *Camille v. Colvin*, 652 F. App'x 25 (2d Cir. 2016); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Moreover, the Second Circuit recently ruled that the ALJ provided good reasons for giving little weight to treating source opinions similarly relayed merely through checkbox-type forms that offered little or nothing in terms of supporting or corroborating clinical findings and diagnostic results. *See Holler*, 852 F. App'x at 585; *Heaman v. Berryhill*, 765 F. App'x 498 (2d Cir. 2019). Such was the case here. Dr. Gurske-dePerio's form included virtually no supportive text or explanations. Tr. 358. Although the ALJ could have been more explicit in addressing the *Burgess* factors, the ALJ's decision to grant the opinion only "some" weight (Tr. 39) was well supported, and the Court finds that this opinion would not have been entitled to controlling (or even significant) weight even had the ALJ expressly mentioned each factor. Accordingly, remand here would serve no purpose, and the Court finds no error.

Plaintiff next argues that the ALJ erred at step two when she found that agoraphobia was not its own severe impairment. *See* ECF No. 13-1 at 17-19. However, the record fails to show any symptoms or limitations attributable solely to agoraphobia that were independent of the many other severe mental impairments the ALJ did find, including PTSD, ADHD, depression, anxiety

disorder, bipolar disorder, antisocial personality disorder, other specified psychotic disorder, and adjustment disorder with mixed anxiety and depressed mood. Tr. 30-32. Although Plaintiff points to a number of alleged symptoms that might be consistent with agoraphobia, he fails to mention the many overlapping severe mental impairments above, or how any of the symptoms he cites are attributable to agoraphobia alone. Furthermore, medical sources often define agoraphobia as a type of anxiety disorder causing patients to fear and avoid places or situations that might cause them to panic, feel trapped, helpless, or embarrassed.[4] Thus, having found anxiety disorder and anti-social personality disorder (as well as eight other severe mental impairments) to be severe impairments, it is unclear what additional limitations Plaintiff claims were overlooked.

In establishing a disability under the Act, the operative question is not what illness or condition is present; it is the limitations, if any, such a condition has upon the claimant's functional abilities. *See* 20 C.F.R. § 416.921. Accordingly, the Court finds that any omission of Plaintiff's agoraphobia diagnosis at step two was harmless. Where an ALJ proceeds past step two and considers the effects of all the claimant's impairments through the remainder of the sequential evaluation process, any error at step two is harmless. *See O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014) (holding that step two errors are harmless when the ALJ identifies other severe impairments and proceeds in the sequential evaluation process); *Stanton v. Astrue*, 370 Fed. App'x 231, 233 n.1 (2d. Cir. 2010). Such is the case here, because the ALJ continued to consider Plaintiff's mental impairments and resultant limitations throughout the sequential evaluation.

Indeed, at step three, the ALJ included a lengthy discussion of the "Paragraph B" criteria of listings 12.04 and 12.06, including detailed discussions of Plaintiff's ability to interact with others, concentrate, persist, and maintain pace, and adapt or manage oneself. Tr. 33-34. This

---

[4] *See e.g.*, Mayo Clinic website, https://www.mayoclinic.org/diseases-conditions/agoraphobia/symptoms-causes/syc-20355987 (last visited Nov. 18, 2022.)

included explicit discussion of Plaintiff's ability to get along with others, social isolation, legal problems, anger and irritability, family relationships, ability to interact with supervisors, coworkers, and the public, and ability to regulate his emotions and behavior. Tr. 33. The ALJ continued, finding numerous non-exertional limitations, including expressly limiting Plaintiff's ability to deal with stress, limiting his ability to tolerate minimal changes in processes and settings, and limiting his interactions with supervisors, coworkers, and the public. Tr. 35.

In so finding, the ALJ considered Plaintiff's allegations that he "only goes out for doctor appointments, has no social life, suffers from severe attacks while traveling in vehicles, and being around others and cannot go out alone[.]" Tr. 35-36. The ALJ further noted "no social activities or interaction aside from doctor appointments," as well as reported "difficulties getting along with family, friends, and neighbors," as well as "bosses, teachers, police, landlords, and other people in authority[.]" Tr. 36. The ALJ further noted that Plaintiff's anxiety triggers included moving vehicles, and that he cannot travel by himself. Tr. 36. Next, the ALJ expressly noted Plaintiff's testimony that he had been unable to retain jobs due to his mental health conditions "which cause him to be agoraphobic, explosive, and have panic attacks[.]" Tr. 36. Thus, the ALJ explicitly considered the possible limitations stemming from agoraphobia in the RFC section. Because the ALJ found numerous mental impairments, some of which inherently overlap with agoraphobia; expressly discussed Plaintiff's social abilities at step three; expressly mentioned agoraphobia in finding the RFC; and, indeed, found social limitations in the RFC, the Court finds Plaintiff's step two challenge meritless.

As previously noted, Plaintiff bears the ultimate burden of proving that he was more limited than the ALJ found. *See Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) ("Smith had a duty to prove a more restrictive RFC, and failed to do so."); *Poupore*, 566 F.3d at 306 (it remains

28

at all times the claimant's burden to demonstrate functional limitations, and never the ALJ's

burden to disprove them). While Plaintiff may disagree with the ALJ's conclusion, Plaintiff's

burden was to show that no reasonable mind could have agreed with the ALJ's conclusions, which

he has failed to do.

Based on the foregoing, substantial evidence in the record supports the ALJ's RFC finding.

The substantial evidence standard is "a very deferential standard of review – even more so than

the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless

"a reasonable factfinder would *have to conclude* otherwise." *Brault*, 683 F.3d at 448 (emphasis in

the original); *see also McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("[i]f evidence is

susceptible to more than one rational interpretation, the Commissioner's conclusion must be

upheld."); *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (holding that "[t]he relevant

inquiry is whether the ALJ applied the correct legal standards and whether the ALJ's determination

is supported by substantial evidence," and where the ALJ's analysis permits meaningful judicial

review, remand is not warranted solely for a more explicit analysis). As the Supreme Court

explained in *Biestek v. Berryhill*, "whatever the meaning of 'substantial' in other contexts, the

threshold for such evidentiary sufficiency is not high" and means only "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1154 (2019) (internal citations omitted).

For all the reasons discussed above, the Court finds that the ALJ properly considered the

record as a whole, including the medical opinion evidence, the treatment reports, and Plaintiff's

testimony, and the ALJ's findings are supported by substantial evidence. Accordingly, the Court

finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 13) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 14) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.


DON D. BUSH
UNITED STATES MAGISTRATE JUDGE